Jack A. EKCHIAN, Plaintiff–Appellant,

v.

The HOME DEPOT, INC., Macklanburg–Duncan Company, MTI Corporation and Zircon Corporation, Defendants,

and

Lucas Automation & Control Engineering, Inc., Defendant–Appellee.

No. 96–1207.

United States Court of Appeals, Federal Circuit.

Jan. 10, 1997.

Berj A. Terzian, Pennie & Edmonds, New York City, argued, for plaintiff-appellant. With him on the brief was Brian M. Rothery. Of counsel, on the brief, were John W. Olivo, Jr. and John F. Ward, Ward & Olivo, New York City.

Stanley C. Spooner, Nixon & Vanderhye, Arlington, VA, argued, for defendant-appellee. With him, on the brief, was Jeffrey H. Nelson. Of counsel, on the brief, was Robert Leier, Lucas Industries, Inc., Reston, VA.

Before LOURIE, CLEVENGER, and BRYSON, Circuit Judges.

LOURIE, Circuit Judge.

Jack A. Ekchian appeals from the final judgment of the United States District Court for the Eastern District of Virginia granting summary judgment of non-infringement in favor of Lucas Automation & Control Engineering, Inc. ("Lucas"). *Ekchian v. Home Depot, Inc.*, No. 95–1273–A (E.D.Va. Dec. 8, 1995) (as corrected by Order entered on Dec. 11, 1995). Because the district court misconstrued the asserted claims and because, under a proper claim construction, genuine issues of material fact remain in dispute, we vacate and remand.

## BACKGROUND

Ekchian is the owner and a named co-inventor of U.S. Patent 4,624,140. The '140 patent concerns variable capacitance displacement sensors which can be used as inclinometers (such as in a carpenter's level) to measure degree of inclination or tilt. Variable capacitance inclinometers use an internal capacitor having a capacitance that is proportional to the degree of inclination.

A capacitor is formed by sandwiching a dielectric between two conductive surfaces or "plates." Capacitors store electric charge on the "overlapping" portions of the two conductive plates, creating an electric field across the dielectric material. An ideal capacitor has completely conductive plates and a nonconductive dielectric material so that charges flow easily through the plates, but do not cross the dielectric, thereby accumulating at the boundaries formed by the plates and the dielectric. Because real-world materials rarely approach the ideal, capacitors generally have less than perfectly conductive plates and contain dielectric materials that conduct some charge. Generally, for a capacitor to function properly, the conductivity of the capacitor plates must be substantially greater than the conductivity of the dielectric.

The capacitance of a capacitor generally depends upon three factors. Capacitance is proportional to the area of overlap of the conductive plates and to the magnitude of the "dielectric constant" of the dielectric material (a fixed value for a given material), and it is inversely proportional to the thickness of the dielectric.

Prior art variable capacitance inclinometers generally used two solid plates with a liquid dielectric partially filling the space between the plates. The remainder of the space was filled by a gas that typically had a substantially lower dielectric constant than the liquid. Thus, the average dielectric constant was a function of both the liquid and the gas. These inclinometers were constructed so that as they were tilted, the amount of liquid filling the space between the plates changed. As the ratio of liquid to gas changed, the average dielectric constant of the space changed, thereby affecting the measured capacitance across the plates.

The '140 invention differs from these prior art inclinometers by replacing the liquid with a solid dielectric and replacing one of the

fixed capacitor plates with a conductive liquid. The patent specification discloses a vessel, partially filled with a conductive liquid, that has a solid conducting interior wall with a thin dielectric coating. A capacitor is formed by the overlap of the liquid and the vessel wall (or fixed plate), which are separated from each other by the thin dielectric coating, as illustrated below.

As the vessel is tilted, the amount of liquid in contact with the dielectric coating changes. Instead of varying the average dielectric constant, the claimed device varies the amount of overlap between the vessel wall and the liquid in proportion to the degree of inclination. Because the thickness of the dielectric coating can be considerably less than the thickness of a liquid dielectric, the claimed device improves on the prior art by producing a substantially greater capacitance compared with the prior art devices.

Claim 1, with emphasis added, is representative of the asserted claims and reads as follows:

1. A capacitive displacement sensor, comprising

a vessel having a wall including at least two adjacent conductive wall segments,

means for electrically insulating said wall segments from each other,

a dielectric coating on the interior of at least one but not all of said wall segments, the interior of at least one conductive wall segment being exposed,

*a conductive liquid-like medium* contained inside said vessel covering a variable part of at least one wall segment with said dielectric coating and at least one wall segment without said dielectric coating, and

electronic means electrically connected to at least one wall segment with said coating and at least one wall segment without said coating for producing an output related to the capacitance between said liquid-like medium and said one wall segment with said dielectric coating,

whereby displacement of said vessel causes relative movement between said vessel and said liquid-like medium and a concomitant detectable change in the capacitance between said liquid-like medium and the wall segment with the dielectric coating.

Ekchian filed suit against Lucas alleging that the Lucas "Accustar" inclinometers infringe every claim of the '140 patent. The accused device uses a vessel partially filled with liquid and has a thin film coating on an interior wall. Lucas denied infringement, claiming that the liquid in the accused device acts as a dielectric across which an electric field is generated and that, in any event, its liquid is not sufficiently conductive to be covered by the claims of the patent.

On Lucas's motion for summary judgment, the district court construed the claim term "conductive liquid-like medium" as requiring a conductivity similar to the examples contained in the specification, which exceed the conductivity level of the liquid in the accused device. The court held that in light of its claim construction and based upon prosecution history estoppel, the accused device did not infringe the patent, literally or under the doctrine of equivalents.

## DISCUSSION

We review a district court's grant of summary judgment *de novo*. *Conroy v. Reebok Int'l, Ltd.*, 14 F.3d 1570, 1575, 29 USPQ2d 1373, 1377 (Fed.Cir.1994). Summary judgment is appropriate when no genuine issue as to any material fact exists and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). On summary judgment, the evidence must be viewed in the light most favorable to the party opposing the motion, *Poller v. Columbia Broad. Sys., Inc.*, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962), with doubts resolved in favor of the nonmovant, *Cantor v. Detroit Edison Co.*, 428 U.S. 579, 582, 96 S.Ct. 3110, 3113, 49 L.Ed.2d 1141 (1976); *Transmatic, Inc. v. Gulton Indus., Inc.*, 53 F.3d 1270, 1274, 35 USPQ2d 1035, 1038 (Fed.Cir.1995).

Determining whether a patent claim has been infringed requires a two-step analysis: "First, the claim must be properly construed to determine its scope and meaning. Second, the claim as properly construed must be compared to the accused device or process." *Carroll Touch, Inc. v. Electro Mechanical Sys., Inc.*, 15 F.3d 1573, 1576, 27 USPQ2d 1836, 1839 (Fed.Cir.1993). Claim construction is a question of law. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 983–84, 34 USPQ2d 1321, 1333 (Fed.Cir.1995) (in banc), *aff'd*, —— U.S. ——, 116 S.Ct. 1384, 134 L.Ed.2d 577, 38 USPQ2d 1461 (1996). In construing the claims, the court looks to the patent itself, the prosecution history, and, if necessary, · extrinsic evidence. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582–83, 39 USPQ2d 1573, 1576–77 (Fed.Cir. 1996).

Application of a properly construed claim to an accused device is a question of fact. On appeal from a grant of summary judgment of noninfringement, we must determine whether, on the patentee's version of the facts, the district court correctly concluded that the patentee had failed to show that a reasonable jury could find infringement. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Conroy*, 14 F.3d at 1575, 29 USPQ2d at 1377 ("The moving party ... may discharge its burden by showing the district court that there is an absence of evidence to support the nonmoving party's case.").

In construing the claims of the '140 patent, the district court declined to adopt Ekchian's proposed definition of "conductive" as "the slightest ability to carry a current" because it concluded that such an interpretation would render the limitation meaningless, essentially reading the term "conductive" right out of the claims. Because Ekchian's proposal would "include virtually all liquids (and, indeed, all materials) on the planet," the district court sought a narrower definition that would render the term meaningful. The court concluded that, as a matter of law, the claimed conductive liquid-like medium did not extend to the liquid in the accused device. In particular, it determined that the liquid in the accused device "is vastly less conductive" than the preferred liquid mentioned in the patent specification and that the two liquids appear to be used for different purposes, the invention employing a liquid as a capacitor plate and the accused device employing a liquid as a dielectric.

Ekchian argues that the district court erred in its claim construction by reading the conductivity of the preferred embodiment into the claims. Ekchian contends that the patent does not impart any special meaning to the term "conductive" and therefore that the term's ordinary meaning to those skilled in the art should control. Lucas, on the other hand, contends that the district court properly interpreted the claim in light of the specification and that the patent defines "conductive liquid-like medium" as being limited to liquids having a conductivity equal to or greater than the examples listed in the specification. To support its proposition, Lucas relies on the following sentence in the specification which states, "Accordingly, the label 'conductive liquid-like medium' used herein shall refer to materials of whatever kind whether liquid or not, meeting the foregoing requirements of flowability, conformity, horizontal surface retention and conductivity." '140 patent, col. 5, line 66—col. 6, line 2.

Lucas argues that the examples of conductive liquids in the specification are the only

"foregoing requirements of ... conductivity" disclosed in the patent and therefore must be read as limiting the claim term. We do not agree. Contrary to the assertion by Lucas, the expression "the foregoing requirements" also refers to the enumerated requirements immediately preceding the quotation, which include, "[i]n addition, all points beneath the horizontal upper surface of the liquid medium must be conductive, preferably but not necessarily uniformly conductive." '140 patent, col. 5, lines 60–63. The statement thus is not a reference only to the stated examples, as Lucas asserts.

■ More importantly, Lucas identifies nothing further to support its contention that the term "conductive" is limited to the conductivity levels inherent in the disclosed examples. While examples disclosed in the preferred embodiment may aid in the proper interpretation of a claim term, the scope of a claim is not necessarily limited by such examples. See Laitram Corp. v. Cambridge Wire Cloth Co., 863 F.2d 855, 865, 9 USPQ2d 1289, 1299 (Fed.Cir.1988) ("References to a preferred embodiment, such as those often present in a specification, are not claim limitations."); Texas Instruments, Inc. v. United States Int'l Trade Comm'n, 805 F.2d 1558, 1563, 231 USPQ 833, 835 (Fed.Cir.1986) ("This court has cautioned against limiting the claimed invention to preferred embodiments or specific examples in the specification."). We therefore conclude that the term is not so limited.

Because the specification does not use the term "conductive" in a special or unique way, its ordinary meaning to one skilled in the art controls. See Quantum Corp. v. Rodime, PLC, 65 F.3d 1577, 1580, 36 USPQ2d 1162, 1165 (Fed.Cir.1995) ("[T]he words of a claim will be given their ordinary meaning to one of skill in the art unless the inventor appeared to use them differently."); cf. Texas Instruments, Inc. v. Cypress Semiconductor Corp., 90 F.3d 1558, 1564, 39 USPQ2d 1492, 1497 (Fed.Cir.1996) ("Although the dictionary broadly defines 'conductor' as any substance that conducts an electrical charge, the patent itself belies such a broad construction.").

■ Ekchian contends that those skilled in the art would recognize that the term "conductive liquid-like medium" in the context of the claimed invention refers to any material that is sufficiently more conductive than the dielectric so that a capacitor is formed. We agree. There is nothing in the patent specification that suggests that Ekchian intended to limit the meaning of that term to a specific range of conductivity. This does not mean that the claim term "conductive" is meaningless or superfluous. Both Lucas and Ekchian agree that the term "conductive" ordinarily means the ability to transport electric charge. Furthermore, it is undisputed that the specification and prosecution history both state that the liquid must act as a capacitor plate, which must necessarily store electric charge. Therefore, one skilled in the art of capacitor design would recognize that the term "conductive" modifies "liquid-like medium" in the claims to indicate that the liquid must act as a capacitor plate, i.e., that it must be sufficiently more conductive than the dielectric material so that it stores electric charge. Accordingly, we hold that the district court erred in its claim construction by incorrectly limiting the degree of conductivity permitted by the term "conductive liquid-like medium." Within the context of this patent, "conductive liquid-like medium" means a medium sufficiently conductive to perform its function as a variable capacitor plate.

■ Ekchian also argues that the district court erred by holding that prosecution history estoppel precludes a finding of infringement. He first contends, and states the issue to be one of first impression, that an Information Disclosure Statement ("IDS") cannot be the basis for an estoppel because it is not submitted to the Patent Office in order to overcome a rejection by the examiner. We do not agree with this argument. An IDS is part of the prosecution history on which the examiner, the courts, and the public are entitled to rely. Ekchian distinguished his invention from the submitted prior art as a kind of preemptive strike against a potential rejection. He intended his statement to be relied on. It is reasonable to infer, absent an indication to the contrary, that an examiner will consider an IDS when

determining whether to allow the claims; the courts and the public may rely on it as well. An argument contained in an IDS which purports to distinguish an invention from the prior art thus may affect the scope of the patent ultimately granted. Accordingly, we first hold that statements made in an IDS can be the basis for a court to interpret the scope of the claims of a granted patent. *See Standard Oil Co. v. American Cyanamid Co.,* 774 F.2d 448, 452, 227 USPQ 293, 296 (Fed.Cir.1985) (stating that the prosecution history, which includes "all express representations made by or on behalf of the applicant to the examiner to induce a patent grant," limits the interpretation of the claims "so as to exclude any interpretation that may have been disclaimed or disavowed during prosecution in order to obtain claim allowance."). Moreover, since, by distinguishing the claimed invention over the prior art, an applicant is indicating what the claims do not cover, he is by implication surrendering such protection. *See Southwall Techs. Inc. v. Cardinal IG Co.,* 54 F.3d 1570, 1581, 34 USPQ2d 1673, 1681 (Fed.Cir.1995) (stating that the patentee, having distinguished a prior art reference in arguments made to the PTO, "cannot now escape [the defendant's] reliance upon this unambiguous surrender of subject matter"). To that extent, we also hold that arguments in an IDS can create an estoppel, and thus preclude a finding of infringement under the doctrine of equivalents. *See, e.g., Texas Instruments, Inc. v. United States Int'l Trade Comm'n,* 988 F.2d 1165, 1174, 26 USPQ2d 1018, 1025 (Fed.Cir.1993) (discussing impact of statements made in an invention disclosure form placed in PTO file in the context of prosecution history estoppel).

■ Ekchian next contends that even if the IDS is fair game for use in claim interpretation and for purposes of estoppel, the district court erred by mischaracterizing his arguments regarding the prior art. The court determined that Ekchian differentiated his device from the prior art on the ground that the liquid in his device was conducting while the liquid in the prior art patent was nonconducting. In light of the prosecution history, the court concluded that Ekchian's claimed liquid-like medium must necessarily be more conductive than the liquid disclosed in the prior art patent. Ekchian asserts that no such distinction was made. He contends that he differentiated his invention on the ground that he uses a solid dielectric with a liquid capacitor plate while the prior art used a liquid dielectric and solid capacitor plate. We agree. The statements in the IDS distinguished the prior art's use of a liquid dielectric from Ekchian's invention as follows:

[The prior art] device differs from the inclinometer of the present invention in which a variable capacitance is established between a rigid wall of a vessel, preferably spherical, and an electrically conductive fluid, liquid, paste, or solid powder mixed in a liquid, which acts as *a conductive liquid capacitor plate* as the device tilts. The vessel surface has a thin coating of a *solid dielectric material* of uniform thickness. (emphasis added)

Thus, Ekchian did not distinguish the conductivity of his liquid from the conductivity of the liquid in the prior art. In fact, the prior art patent does not refer to the conductive properties of its disclosed liquid.

Lucas argues nonetheless that Ekchian, in the IDS, explicitly referred to the prior art liquid as an "insulator" and therefore contends that liquids having similar conductivity levels cannot be construed to be conductive within the scope of the claims or be considered equivalent to the claimed liquid. We find this argument to be without merit. Ekchian did refer generally to the benefits of using a solid insulator instead of a liquid insulator as a dielectric. However, Ekchian did not characterize the specific liquid used in the prior art device as an insulator, nor did he state whether that liquid could be used as a conductor in a different device. Accordingly, the prosecution history supports the conclusion that the term "conductive" is not limited by the conductivity of the liquid disclosed in the prior art.

■ Finally, given the proper claim construction, we agree with Ekchian that genuine issues of material fact are in dispute. The district court stated that "the Lucas liquid is employed as a non-conductive dielectric with the express purpose of regulating

and/or impeding the charge flow across its capacitor plates" and "[t]he Lucas liquid operates in a manner that is virtually identical to that of the [prior art] patent." Ekchian vigorously contests these characterizations of the accused device, submitting evidence tending to indicate that the Lucas liquid does not act as a dielectric. For example, Ekchian submitted an affidavit in which he averred that (1) when the Lucas liquid is replaced by a highly conductive fluid, its capacitance remains the same and (2) when the Lucas liquid is replaced by a fluid with an extremely low conductivity, its capacitance drops substantially. Both these tests support the conclusion that the electric charges in Lucas's accused device are stored in the liquid and not on the fixed plate. Ekchian's tests thus support his position that the liquid in the accused device acts as a capacitor plate and not as a dielectric as the district court and Lucas both assumed.

The district court appeared to rely on Lucas's assertion that its device operates in the same manner as described in U.S. Patent 4,644,662, which is assigned to Lucas. Ekchian submitted affidavits that may show that Lucas is incorrect. Because there is a genuine dispute as to whether the accused device uses its liquid as a dielectric or as a capacitor plate, the court erred by not resolving this doubt in favor of Ekchian on Lucas's motion for summary judgment. *See Conroy v. Reebok Int'l, Ltd.*, 14 F.3d 1570, 1577, 29 USPQ2d 1373, 1378 (Fed.Cir.1994). On remand, it is for the fact-finder to determine whether the liquid in the accused device acts as the capacitor plate, *i.e.*, stores the electric charge that generates the measured capacitance. If the liquid acts as a capacitor plate, then the liquid is a "conductive liquid-like medium" within the meaning of the claims.

## CONCLUSION

The patent claims, specification, and prosecution history uniformly indicate that the patentee intended the term "conductive" to take on its ordinary and accustomed meaning. Therefore, the claim term "conductive liquid-like medium" requires a liquid-like medium that acts as a capacitor plate by storing electric charge. Because the district court

erred in construing the term "conductive," we vacate the judgment in favor of Lucas and remand for further proceedings in light of this opinion.

*VACATED AND REMANDED.*